MARY L. BROOKS, administratrix, *vs.* BOSTON AND MAINE
RAILROAD.

Middlesex.    March 14, 1905. — June 21, 1905.

Present: KNOWLTON, C. J., MORTON, LATHROP, BARKER, & HAMMOND, JJ.

*Negligence. Railroad.*

It is not the duty of a railroad company to construct and maintain its gates at an
ordinary crossing on the main street of a town of sufficient strength to withstand
a runaway horse dashing against or rearing over them.

TORT by the administratrix of Edward F. Brooks for personal injuries to the plaintiff's intestate resulting in his death alleged to have been caused by the negligence of the defendant's servants in running an engine and cars against a team owned and driven by the intestate, at the Main Street crossing of the defendant's railroad in Reading early in the afternoon of June 7, 1902. Writ dated September 16, 1902.

In the Superior Court *Bell*, J. ordered a verdict for the defendant; and the plaintiff alleged exceptions.

*W. M. Lindsay*, (*C. K. Darling* with him,) for the plaintiff.

*F. N. Wier*, for the defendant, was not called upon.

KNOWLTON, C. J. The plaintiff's intestate and two children who were riding with him were run over and fatally injured at

a street crossing of the defendant's railroad in Reading.   Some
of the circumstances attending the accident are stated in the
bill of exceptions as follows: "While on the main street, and
some mile or mile and a half from the grade crossing in ques-
tion, the horse driven by Mr. Brooks became frightened.   When
within about five hundred and seventy feet of the Main Street
crossing, a witness testified substantially that he saw Mr. Brooks
pulling on the reins of his horse and calling out ' Whoa! whoa!'
At this time the horse had his head down, was running very
fast and the bits appeared to be between his teeth; that from
this point down to the time that the team got to the Main
Street crossing Mr. Brooks was pulling on the reins and talking
to his horse.   One witness testified that the horse when within
one hundred feet of the crossing had come down to a trot but
had the appearance of having run away.   When within twelve
or fifteen feet of the gates, which were down, the horse turned and
swerved sharply to the left, ran along even or parallel with the
gate arms, lunging and rearing.   Another witness testified that
she saw Brooks pull the horse over to his left when he was
within twelve feet of the gate and that he was coaxing him to
be quiet.   When the horse came to that portion of the gate arm
which was braced the most, and which rested or rocked on the
iron standard or gate post, the horse went against the gate arm,
or reared over it, breaking the gate arm short off, and the gate
arm, horse, carriage and occupants pitched right over on to the
railroad between the rails of the south bound track, and in a
few seconds the train of the defendant came along, struck the
team and caused the injury complained of. . . . The evidence
shows that the gates were down when the plaintiff's intestate
passed a house about five hundred and seventy feet from the
crossing. . . . A view of Main Street in the direction from
which the team in question came could be seen for nearly a
mile as one stood in or upon the highway on the location at
Main Street."

We will assume in favor of the plaintiff, without deciding,
that there was evidence from which the jury might have found
that her intestate was in the exercise of due care.   The impor-
tant question in the case is whether there was any evidence that
the accident was caused by negligence of the defendant.   The

weight of the evidence is in favor of the defendant's contention that the signals required by the statute were given as the train approached the crossing, although perhaps there was evidence upon which that question might have been submitted to the jury. It was an undisputed fact that the gates were down a considerable time before the horse reached the crossing, thus giving to the driver full information that a train was expected, and that he could not safely attempt to cross. It was early in the afternoon, in the full light of day, and the plaintiff's intestate was very familiar with the crossing. If the jury could have found that the bell was not rung continuously for a distance of eighty rods before the train reached the crossing, there was no evidence to warrant them in finding that this neglect caused the accident. The plaintiff's intestate was sufficiently warned that a train was approaching, and he evidently was acting in the belief that he could not cross safely. His horse had been frightened by an automobile, and could not be controlled. The train which struck him was a passenger express, running on a slightly descending grade, at a rate of speed which was estimated by different witnesses differently, the engineer giving it at thirty to thirty-five miles an hour, and some calling it forty to fifty miles an hour. There is nothing to show that the accident was caused by running the train at an excessive rate of speed. Seemingly the rate was not greater than is usual for express trains in the country, and if it had been less there is nothing to indicate that the accident would have been avoided. The engineer could not see the horse and carriage until he was almost upon them.

It is contended that the gates were not so strong as they should have been ; but the evidence shows that they were " the usual ones erected at independent crossings," and there was no evidence that, for such places as this, any other kind would be better. As was said in *Marks* v. *Fitchburg Railroad*, 155 Mass. 493, 496, " Ordinarily, the principal purpose of gates is effectually to warn travellers not to cross." While in peculiar situations considerable strength may be desirable, it is necessary that they should be so light that they can be raised and lowered quickly, with mechanism that can be easily controlled, and it would be unreasonable and impracticable at ordinary crossings

to construct them of such strength as to withstand the force of a runaway team dashing at full speed against them. At a crossing such as the evidence in this case shows, we are of opinion that the defendant was not called upon to maintain gates which would successfully sustain such a shock as this gate yielded to. It is to be noticed that there was no evidence of a defect or want of repair in the gates, but the contention is that the kind of gate should have been different from that in common use. In *Marks* v. *Fitchburg Railroad*, 155 Mass. 493, the facts which were held to require the submission of the evidence to a jury were materially different from those now before us.

It also is contended that the company was negligent in not having a gateman or flagman on the ground at the crossing, instead of operating the gates by an attendant in a tower, who at the same time by the same movement operated another gate at another crossing, one hundred and twenty feet away. We are of opinion that this contention is not well founded. The gates were operated effectually, and proper warning was given in this way. If there had been a gateman on the ground, it is difficult to see what he could have done to avert this accident. Gatemen are not employed to place themselves in front of runaway horses for the purpose of stopping them. An attempt of this sort is more likely to be harmful than otherwise.

This lamentable accident happened from causes for which the defendant was not responsible, and against which it was not called upon to make such provision as to render an injury impossible. It was, under the law, to take proper precautions for the safety of travellers on the highway, having reference to all the conditions and probabilities to be anticipated.

We discover in the bill of exceptions no evidence of negligence on the part of the defendant or its servants which was a direct and proximate cause of the accident.

*Exceptions overruled.*