BLANCHE G. HUNTINGTON, by next friend,

*vs.*

BANGOR & AROOSTOOK RAILROAD COMPANY.

Piscataquis.    Opinion May 14, 1909.

*Railroad Crossings.    Flagman.    Gates.    Negligence.    Accidents without Liability.*

A railroad company is bound to take reasonable and proper precautions for the safety of travelers upon the highway having reference to all the circumstances and probabilities to be anticipated and when a railroad crossing is especially dangerous the railroad company must employ such means as are reasonably necessary considering its character, to warn travelers of the approach of a train.

It is difficult if not impossible to lay down an abstract rule of law as to the exact time when or the exact distance at which travelers should be warned of an approaching train. It must be governed largely by the circumstances and surroundings of each particular case. In a general way it may be said that it is a flagman's duty to give such seasonable warning as will enable a traveler to stop his team at a point where an ordinarily well broken and gentle horse would not become dangerously frightened. Circumstances and conditions might modify this and impose a greater obligation upon him but this would seem to be a workable principle.

A flagman whose duty it is to guard a railroad crossing over a public street and who remains at his post of duty until an approaching train has reached the crossing and is passing the same, is not negligent in then leaving his post as the train itself then becomes a warning.

When gates at a railroad crossing would not cause a traveler approaching such crossing to stop any sooner than a flagman, it is not negligence on the part of the railroad company to maintain a flagman at such crossing instead of gates attended by a watchman.

The purpose of gates at a railroad crossing over a public street, is merely to give warning that trains are passing or about to pass, and it cannot be successfully contended that under ordinary circumstances gates should be maintained as a barrier to runaway teams.

The plaintiff, a girl of nineteen and who was an expert horsewoman, was driving along a public street towards the point where the defendant's railroad crossed the street. She was entirely familiar with the crossing and its approaches. The horse driven by her was seventeen or eighteen years old and was regarded as perfectly kind and safe and not afraid of moving trains. When the plaintiff was approaching the crossing she saw the

defendant's flagman standing near the crossing and towards the westerly side of the street but he was not waving his flag. Upon seeing the flagman, however, the plaintiff immediately stopped at a point ninety-one feet from the crossing. She had not then heard any bell or whistle or seen any approaching train. She remained stationary, the horse entirely docile and unfrightened, for what she said seemed to her a long time, when the engine and the forward cars of a long freight train came into view at the crossing, moving at the rate of about four miles an hour, on an up-grade, with all the noise usually attendant under such conditions. While the train was passing the crossing, the horse suddenly started and dashed against the train with such force as to throw the plaintiff from the wagon and beneath the train and resulting in the loss of her left hand at the wrist.

*Held:* That the defendant was neither responsible nor liable for the plaintiff's injuries, but that the case belongs to a class of lamentable accidents for which no one is legally liable.

On motion by defendant. Verdict set aside.

Action on the case to recover damages sustained by the plaintiff in a crossing accident, and alleged to have been caused by the negligence of the defendant. Plea, the general issue. Verdict for plaintiff for $6125. The defendant then filed a general motion to have the verdict set aside.

The case is stated in the opinion.

*Hudson & Hudson,* for plaintiff.

*Louis C. Stearns, F. H. Appleton,* and *Hugh R. Chaplin,* for defendant.

SITTING: EMERY, C. J., WHITEHOUSE, SPEAR, CORNISH, KING, BIRD, JJ.

CORNISH, J. This is an action on the case to recover damages for personal injuries received in a crossing accident, November 4, 1907, and comes to this court on defendant's motion to set aside a verdict for the plaintiff.

The crossing in question is over South Main Street in the thickly settled portion of the village of Guilford. Ninety-one feet south of the crossing an iron bridge, one hundred and seventy-four feet long and nineteen feet wide in the clear, spans the Piscataquis River. South of this bridge South Main Street ascends a steep hill known as Bridge hill, at whose top is a public square. To a traveler

going north, as was the plaintiff, the view of the railroad crossing from the square, a distance of between four hundred and five hundred feet, is clear and unobstructed and remains so until the crossing is reached.  The railroad track or a railroad train east of the crossing is discernible to such traveler only at intervals owing to intervening buildings on the north side of the river.

For twenty-five years the railroad company has employed as a flagman one Cimpher, a harness-maker with a shop on the westerly side of the street, near to and south of the crossing.  About three o'clock in the afternoon of the day of the accident, the plaintiff, a girl of nineteen, started with a team from her home about one and a half miles south of Guilford Village, to go over the route above described to the school house situated north of the crossing in question to bring her brothers from school as was her custom.  She was entirely familiar with the crossing and its approaches.  The horse was seventeen or eighteen years old, had been her favorite family horse for a year and was regarded as perfectly kind and safe.  She herself was an experienced horsewoman having driven since she was eight or nine years old.  On arriving at the Village Square she walked her horse down Bridge hill, and while descending the hill says that she looked across the river but did not see the flagman at the crossing.  As she was entering on the bridge she looked down and across the river but saw no train, although at various points one must have been plainly visible.  She continued slowly across the bridge either at a slow trot or a walk, and when she reached the north end she saw the flagman for the first time as he was standing near the crossing and toward the westerly side of the street.  He was not waving his flag but the plaintiff readily interpreted the meaning of his presence and immediately stopped, "because," as she testified, "I saw him with his flag."  She had not then heard any bell or whistle or seen any approaching train. She stopped and remained stationary, the horse entirely docile and unfrightened, for what she says seemed to her a long time, when the engine and the forward cars of an exceptionally long freight train came into view at the crossing, moving from the east at the admitted rate of about four miles an hour, on an up-grade, with the noise

usually attendant upon those conditions. The horse acted "all right" when the engine came into view and while the engine and the first two or three cars were passing the crossing. Then the horse "started all of a sudden, kind of jumped like" as the plaintiff expresses it, or as an eye witness says, "all at once the horse shook his head, and made a rise right up on his hind feet and run toward the train." He dashed against it with such force as to throw the plaintiff from the wagon and beneath the train, from which she was rescued with the loss of her left hand at the wrist.

With this picture of the accident in mind, a picture drawn by the plaintiff herself, can the verdict be sustained? However much we may sympathize with the plaintiff because of her lamentable injury we are unable to find the grounds upon which liability for its occurrence can be fastened upon the defendant. We will assume that there was sufficient evidence to warrant the jury in finding that the plaintiff was in the exercise of due care. The important question remains whether there was evidence that the accident was caused by the negligence of the defendant.

So far as the management of the train itself is concerned no negligence is charged. It is not controverted that in approaching the crossing the proper warnings were given by the engineer and fireman, the whistle was sounded and the bell was rung, while the speed was only four miles an hour.

But the learned counsel for the plaintiff contends that the defendant did not exercise due care in three respects, any one of which would support the verdict. First, because the flagman did not warn the plaintiff seasonably to enable her to stop at a safe distance and avoid the risk of alarm to her horse and of collision. It is difficult if not impossible to lay down an abstract rule of law as to the exact time when or the exact distance at which travelers should be warned of an approaching train. It must be governed largely by the circumstances and surroundings of each particular case. In a general way it may be said that it is a flagman's duty to give such seasonable warning as will enable a traveler to stop his team at a point where an ordinarily well broken and gentle horse would not become dangerously frightened. Circumstances and con-

ditions might modify this and impose a greater or less obligation upon him but this would seem to be a workable principle. Measured by this rule no want of due care can be attributed to the flagman in this case. The evidence shows that this freight train had been engaged in work at the station and on the sidings a considerable distance east of the crossing and that it whistled out of the station as it finally started. This signal brought the flagman from his shop, the door of which was open, to his post of duty in the street where he stood for nearly two minutes before the engine reached the crossing. While standing there he says he saw the plaintiff as she drove onto the southerly end of the bridge a distance of two hundred and sixty-five feet. He was in plain sight of the plaintiff as she walked her horse across the bridge, although her mind did not perceive him until she reached the northerly end. He could not be expected to move towards the bridge, because his duty was to warn teams coming from the north as well as the south and his post was at or near the crossing.

The conclusive fact, however, is that his warning was effectual. It stopped the team at a point and at a time when the horse was in no way disturbed by the train even when the engine and the first two or three of the cars had passed the crossing. It is not a case where neglect of duty incumbent on the defendant or its servants caused the plaintiff to approach so near the passing train that her horse took fright and caused the injury. It was not because of any want of due care on the flagman's part that she omitted to take precautions in regard to her horse which would have avoided the injury, nor because of any neglect of his, did she place herself in such a position in reference to the passing train as she would not otherwise have done and thereby lost control of the horse. It is clear from the plaintiff's own testimony that she stopped the horse at what she deemed a safe place. Had she seen the flagman earlier, she doubtless would not have stopped before she did. Why should she have done so? She had full confidence in herself as a driver. She had full confidence in the gentleness of the horse and felt no fear whatever. She had frequently driven him near moving trains under worse conditions and he had shown no fright. She even

declined the offer of the witness Perkins, who stood nearby, to hold her horse after she had stopped at the end of the bridge, and in reply to his question whether the horse was scared, she said "no, the horse was kind and was not scared of the train," and Perkins added "I told her if her horse was scared I would hold it."

Plainly no omission of the flagman in failing to give seasonable warning was the proximate cause of the accident.

In the second place the plaintiff finds negligence in the defendant in maintaining a flagman instead of gates attended by a watchman. It is true that a railroad company is bound to take reasonable and proper precautions for the safety of travelers upon the highway having reference to all the circumstances and probabilities to be anticipated and when a railroad crossing is especially dangerous the company must employ such means as are reasonably necessary considering its character, to warn travelers of the approach of a train. But we fail to see how gates at this crossing could have been more effective than the flagman, how they could have prevented this accident, or how their non-existence can be construed as the proximate cause of the accident. The purpose of gates is merely to give warning that trains are passing or are about to pass. And gates would not have caused the plaintiff to stop any sooner than did the flagman. Whatever the form of warning, her confidence in the horse governed the stopping place. Nor can it be successfully contended that under ordinary circumstances gates should be maintained as a barrier to runaway teams. Such is not their ordinary purpose. *Marks* v. *Fitchburg R. R. Co.*, 155 Mass. 493; *Brooks* v. *Boston and Maine R. R.*, 188 Mass. 416.

In the latter case the plaintiff claimed that a gateman in addition to the gates should have been maintained. The court disposed of this contention in these words: "We are of opinion that this contention is not well founded. The gates were operated effectually and proper warning was given in this way. If there had been a gateman on the ground, it is difficult to see what he could have done to avert this accident. Gatemen are not employed to place themselves in front of runaway horses for the purpose of stopping

them.  An attempt of this sort is more likely to be harmful than otherwise."  The same doctrine mutatis mutandis applies here.

The third contention made by the plaintiff needs but brief consideration, that is that the flagman left his post of duty before the train passed over the crossing.  The weight of the evidence is against the proposition as a fact.  The flagman may have walked toward the side of the street but he remained in some part of the street until the train reached the crossing and at that moment the train itself became a warning.  "When a traveler sees the train itself in front of him he has all the warning that gates can give." *Theobald* v. *Railway Co.*, 75 Ill. App. 208.  Moreover when the engine had passed the crossing the horse was standing quietly, so that the position of the flagman is entirely immaterial.  He had already fulfilled his duty.

In conclusion it is the opinion of the court that this case belongs to a class of lamentable accidents for which no one is legally liable. *Berry* v. *B. & M. R. R. Co.*, 102 Maine, 213.  The sudden and unaccountable frenzy that seized this old and gentle horse and caused him to plunge into a moving train was an act for which neither the plaintiff nor the defendant was responsible.  Without the slightest warning he did what he had never done before and what the plaintiff had no reason to think he was disposed to do. It seemed unlike the ordinary case of fright because he dashed directly towards and into what might otherwise be considered the cause of his fright.

The sympathy of the jury must have blinded them to the legal principles involved, for the verdict is clearly wrong.

*Motion sustained.*

*Verdict set aside.*